# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### January 11, 2011 Session

## STATE OF TENNESSEE v. LAKEISHA MARGARET WATKINS

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2007-D-3224     Cheryl Blackburn, Judge**

---

**No. M2009-02607-CCA-R3-CD - Filed July 8, 2011**

---

A Davidson County jury convicted the Defendant, Lakeisha Margaret Watkins, of attempted child neglect, four counts of aggravated child abuse, and two counts of aggravated child neglect. The trial court sentenced her to an effective sentence of forty years in the Tennessee Department of Correction. On appeal, the Defendant contends that: (1) the evidence is insufficient to sustain her convictions for aggravated child abuse and aggravated child neglect; and (2) the trial court erred when it ordered her sentences to run consecutively. Because the Defendant's delay in seeking medical treatment for the victim, as proven in Count 5, did not cause serious bodily injury separate and apart from the serious bodily injury caused by the Defendant and proven in Count 4, we are constrained to reverse the conviction for aggravated child neglect in Count 5. The trial court's judgments are affirmed in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed in Part, Reversed in Part, and Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

Jack Byrd (at trial) and James O. Martin, III, (on appeal) Nashville, Tennessee, for the Appellant, Lakeisha Watkins.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Brian Holmgren, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from two separate incidents in 2007 involving the Defendant and her then fifteen-month-old son, C.W.[1], during both of which C.W. was physically assaulted. For her role in these beatings, the Defendant was indicted for one count of child neglect, four counts of aggravated child abuse, and two counts of aggravated child neglect. At the Defendant's trial on these charges, the following evidence was presented: Janelle Driver, a paramedic with the Nashville Fire Department, testified that on April 16, 2007, she and her partner responded to a 911 call received at 6:33 p.m. When she arrived at the location, she saw the Defendant carrying her fifteen-month-old son, C.W., toward the ambulance. The Defendant told Driver that C.W. had fallen around 11:00 a.m. but had acted fine all day until around 6:00 p.m. when he started acting sleepy. Driver noticed a small bruise over the bridge of C.W.'s nose and fingernail scratches on both sides of his neck. Driver said the Defendant accompanied them to the hospital in the ambulance, holding C.W. in her lap for the duration of the ride. Driver said they transported C.W. and his mother to Vanderbilt Hospital without lights and sirens, because Driver did not think C.W. was in danger at the time.

Lawrence Benedict Stack, M.D., an emergency physician at Vanderbilt Children's Hospital, testified he examined C.W. when he was brought to the emergency room on April 16, 2007, accompanied by the Defendant and a man named Christopher Watts. Watts told the doctor that he, the Defendant, and C.W. lived together. He said that he was watching C.W. when the Defendant was at the dentist, and C.W. fell while walking down a hill. Watts reported that C.W. had been sleeping all day since the fall but had been able to eat. Watts said that, as a result of the fall, C.W. had bruising on his forehead in several places as well as multiple abrasions to his upper extremity and face. Neither the Defendant nor Watts disclosed that C.W. suffered from seizures or had a family history of seizures, or that C.W. suffered from any type of bleeding disorder that could result in bruising.

Dr. Stack testified that his notes indicated that C.W. ate fairly well while in the emergency room and that, while a little fussy, C.W. responded when doctors asked him to open his eyes. The doctor noted multiple bruises to the victim's forehead: one on his mid-forehead, one on his left forehead, and one on his left-lateral forehead. C.W. also had bruises on his face, upper arms, and shoulders. The doctor testified that the bruising pattern was not consistent with a single fall. He explained that because the victim suffered "[m]ultiple abrasions on multiple locations from the side of the head, . . . both anterior shoulders and upper arms" it seemed "unlikely that a single fall would cause all of that significant bruising."

The doctor said he found the Defendant "relatively uncooperative" and "quite defensive during the evaluation to the point when we examined the diaper area she suggested not to look there and to focus on h[is] head." When the doctor mentioned the possibility of

---

[1]To protect the victim's privacy, we will refer to him by his initials only.

having social services evaluate the patient, the Defendant stated that no one was going to take her baby away.

Dr. Stack testified that, due to C.W.'s bruising and the Defendant and Watts' report that he had been "sleepy," he ordered a CT scan to determine if there was any traumatic brain injury. The CT scan of C.W.'s brain found no traumatic brain injury. Additionally, Dr. Stack performed a skeletal survey, which showed that there were no bone fractures or injuries to C.W.'s skeleton. The doctor diagnosed C.W.'s multiple contusions to his face and brain as being the result of "suspected child abuse or neglect." Further, he opined that C.W. suffered a concussion.

The doctor also explained that the seven-hour delay in C.W.'s arrival at the hospital after being injured could have led to severe complications. Dr. Stack testified he admitted C.W. into the hospital in order to give social services time to evaluate C.W.'s living situation and to determine if it was safe for C.W. to return home.

On cross-examination, Dr. Stack testified that his notes did not indicate, and he had no independent recollection of, whether some of the bruises on C.W.'s face were older than other bruises. He also stated that the Defendant, who was initially uncooperative, calmed down when her mother arrived at the hospital. During redirect examination, Dr. Stack testified that Dr. Davis, a resident at the hospital, initially took C.W.'s patient history from the Defendant and Watts. Watts told Dr. Davis that C.W. fell "flat on his face, [and that] he did not roll or strike . . . his head more than once."

Falonda Tolston, a case manager for the Department of Children's Services ("DCS"), testified that her employment responsibilities included investigating allegations of abuse and neglect. After Vanderbilt Children's Hospital staff placed a call to DCS on April 16, 2007, alleging they suspected C.W. had been abused or neglected, she was assigned to investigate the allegations. Tolston went to Vanderbilt Children's Hospital on April 17, 2007, to speak with the Defendant, who was in C.W.'s hospital room. When Tolston arrived, she noted C.W. had a knot in the middle, lower portion of his head. C.W.'s eyes were open, he seemed alert, and he was playing and talking with the Defendant and his grandparents, who were all present in the room. C.W. seemed developmentally normal for a fifteen-month-old toddler.

Tolston testified that, during her interview with the Defendant, the Defendant told her that at around 11:00 a.m. on April 16, 2007, C.W. was home with the Defendant's boyfriend, Christopher Watts, while the Defendant was at the dentist's office. When the Defendant returned to the house at around noon, Watts told her that, while she was gone, C.W. had fallen and bruised himself. He said that, when C.W. went with him to take out the trash, they were, at first, holding hands, but that C.W. fell after Watts let go of C.W.'s hand. The Defendant

said Watts told her that he noticed that C.W.'s face was beginning to swell when they got back to the house.

The Defendant went to check on C.W., who was sleeping. She recalled that his face looked swollen, he was scratched, and he was going in and out of sleep. The Defendant said that, when she woke C.W. up around 5:00 or 6:00 p.m. and tried to walk him around, she realized C.W. was not getting better and not acting normally. She, therefore, took him to the emergency room at around 7:00 p.m. The Defendant did not mention that C.W. was transported by ambulance or that it was a neighbor who had called 911.

Tolston recalled that she told the Defendant hospital staff were concerned because the Defendant had become "belligerent" with them and "yelled" at them when they told her that C.W. appeared to have bruises that did not match the Defendant's story. The Defendant agreed she yelled at the staff because she wanted the staff to examine C.W.'s current injuries, but she denied being rude. When Tolston asked the Defendant about C.W.'s other bruises, the Defendant said they must have occurred during the fall because C.W. did not previously have those bruises. The Defendant said she had never seen Watts hurt C.W. and that, if she had, she would have broken off their relationship.

As part of her investigation, Tolston went to the dumpster behind the Defendant's house where the Defendant said C.W. fell. She said the Defendant had described the area near the dumpster as having numerous rocks, and Tolston's inspection revealed fewer than the Defendant had described.

Tolston testified that the Defendant and the Defendant's parents informed her that, when C.W. was released from the hospital, he was going to live with the Defendant's parents in Murfreesboro. Tolston agreed that this was a good decision. The parties agreed that C.W. would reside with his grandparents and receive follow-up care with his primary care doctor.

Tolston testified that, in May, the Defendant's father called Tolston and told her that the Defendant came to Murfreesboro and took C.W. home with her. On May 29, 2007, Tolston went to the Defendant's home to attempt to speak with the Defendant and C.W. When she arrived, the Defendant was at home with C.W., who did not appear to have any new marks, bruises, or cuts and who seemed "fine." Tolston inquired about Watts, and the Defendant said that the two had broken up, that they were no longer living together, and that she had no way of contacting him. Tolston testified that the Defendant never contacted her at any time to inform her that the Defendant and Watts were again dating. Tolston said that, if the Defendant had so informed her, she would have created a "safety plan" to have C.W. placed outside of the Defendant's home or asked Watts to leave the home. On cross-examination, Tolston agreed that there was nothing in the paperwork she created for the

-4-

Defendant that indicated that the Defendant needed DCS permission before she retrieved C.W. from her parents' home. Tolston further agreed that the Defendant's housing agreement prohibited her from allowing someone else to live with her, so the Defendant could have been evicted from her apartment if she had informed Tolston that Watts was again living with her.

On redirect, Tolston said that she expressed to the Defendant, with the Defendant's parents present, her concern about C.W. having any contact with Watts. This concern was based, in part, upon the concern of the hospital staff about the severity of C.W.'s injuries and that C.W. had "old" injuries. The Defendant told hospital staff and Tolston that the "old" injuries were "irrelevant."

Bryan W. Jones, a paramedic with the Metro Fire Department, testified that he and his partner responded to a 911 call on Friday, June 15, 2007, at 10:09 p.m. When he arrived , he found seventeen-month-old C.W. unconscious or, at least, unresponsive and being treated by "basic responders" from the fire department who had arrived shortly before him. The first responders were ventilating C.W. with a bag valve to support C.W.'s airway and breathing, and they brought C.W. to the ambulance when Jones arrived. C.W.'s mother accompanied them to the hospital and provided them with C.W.'s medical history and information.

Jones assessed C.W. and noted that he had "labored respirations" that were not adequate to sustain himself, meaning that he needed intervention to assist his breathing. He also had an irregular heartbeat of 84 beats per minute, which is low for a seventeen-month-old child, and he was "seizing." C.W.'s symptoms of seizure included that his arms and legs were shaking, or convulsing, and he had no control over any of his bodily functions. Jones said he administered Valium rectally, which stopped C.W.'s seizure activity. Jones then established an IV to continue therapeutic and pharmacological care. At this point, C.W.'s heart rate began to improve; however, C.W. again began to have a seizure fifteen minutes after the initial dose of Valium was administered.

Jones recalled that C.W.'s mother told him that C.W. first had a seizure in the morning, eighteen hours before she called for an ambulance. She did not call an ambulance until C.W. became unresponsive and began having difficulty breathing. She denied that C.W. had suffered any recent trauma, and she offered no reason why C.W. would be in this condition. The mother also did not inform Jones that C.W. had suffered a seizure two days before.

Woodrow Ledford, III, a police detective, testified that he responded to the June 15, 2007, call involving C.W. and that he arrived shortly after the first medical unit. He said he spoke with the Defendant, who was sitting in the front seat of the ambulance, while medical personnel were working on C.W. in the back of the ambulance. The Defendant told the officer that C.W. had woken up at 8:00 a.m. that morning "screaming and crying." After she

calmed him, he ate normally but he did not seem to have the same energy level as usual. The Defendant said that, at around 10:00 p.m., she fed C.W. bread and bologna and then left him with her boyfriend, Christopher Watts, while she went to a nearby residence to purchase some "bootleg food." As she was returning, she heard Watts yelling that C.W. was not breathing, so she ran into the house. The Defendant did not indicate that C.W. had suffered from any sort of trauma recently, and she did not disclose that he had suffered a seizure earlier during the day. Detective Ledford said he was unable to locate Watts at the scene. On cross-examination, the detective explained that he understood that "bootleg food" constituted food prepared by some residents of the housing projects in their own kitchen that they would then sell to other residents.

Sandra Moutsios, M.D., the pediatric program director at Vanderbilt Hospital was qualified as an expert in pediatric medicine in the evaluation of child abuse. She testified that C.W. arrived at the Vanderbilt Emergency Room late on a Friday night in June 2007 and was "quite ill." Dr. Moutsios did not treat him initially but was called to assist in his evaluation, which she did the following Sunday morning. The doctor discussed C.W.'s condition with the Defendant on June 17, 2007, while C.W. was still a patient in the pediatric intensive care unit. The Defendant told her that C.W. was previously healthy and that she brought C.W. to the emergency room after Watts found him unresponsive and not breathing.

The Defendant told Dr. Moutsios that C.W. was a normally developing seventeen-month-old about whom she had no concerns until June 13, 2007, when C.W. had an episode of crying, gritting his teeth, and "locking his joints" or clenching his fists, while his eyes rolled back into his head. This lasted about five minutes and resolved on its own. The Defendant said she was unsure what to think but was relieved that it was over, and C.W. acted normally for the remainder of the day. The following day, a Thursday, the Defendant took C.W. to a friend's birthday party, where C.W. jumped in a bounce house, during which time C.W. was using his arms and legs normally.

The Defendant then told the doctor that the next morning, a Friday, she awoke at 8:00 a.m. and noticed that C.W. had climbed out of his playpen, gone downstairs to the first floor, and fallen asleep while standing with his head resting on the couch. Later, C.W. had an episode of screaming, crying, clinching his hands, and extending all four extremities, which resolved in a few minutes. C.W. would not walk, but the Defendant carried him to a seat to get him breakfast. He ate some cereal, drank some milk, and the Defendant gave him some Tylenol. The Defendant said she then put him in his playpen with a fan in an attempt to help him feel better. Dr. Moutsios testified that the Defendant was unclear about the events of the rest of the day, recalling only that C.W. did not want to walk, that he was sleepy, and that he "just wanted to rest."

The Defendant told the doctor that, at around 10:00 p.m., she and Watts were hungry so she left for five or ten minutes to get some food. When she returned, Watts was standing at the door yelling for help, screaming that C.W. was not breathing. When she arrived home, she found C.W. upstairs lying on the floor gasping for breath. Watts attempted to give him CPR, as did a neighbor, and emergency personnel arrived at around 10:15 p.m.

Upon further inquiry, the doctor learned that, after receiving his two-month immunizations, C.W. had not received his immunizations at four months, six months, twelve months, or fifteen months. The Defendant explained that she moved when C.W. was seven months old, and she had not reestablished a primary care provider. The Defendant stated that she was twenty years old and that C.W.'s father was nineteen years old. C.W. rarely saw his father. The Defendant said she and C.W. lived in a housing project together and that her twenty-five-year-old boyfriend, Watts, was often there with them. The Defendant expressed her belief that no one who cared for C.W., including herself, had injured him or been too rough with him. The Defendant denied any alcohol or drug use.

Dr. Moutsios testified that she read C.W.'s intake report before personally examining C.W. Those records indicated that the doctors administered several medications to stop C.W.'s seizures. A CT scan revealed a subdural hematoma on the right side of his head. An MRI indicated that C.W. had a "buckle" fracture to the ulna bone of his arm, which could be caused by a "squeeze injury," a "pull injury," or an "extended arm" sports injury. Dr. Moutsios said that, while this injury was not the most common type of fracture from child abuse because it required a great deal of force, it was unlikely that this injury would be caused by a toddler falling. The MRI indicated some healing in this fracture, so it likely occurred one to two weeks before the MRI was performed. Dr. Moutsios opined that, because this injury would have caused C.W. a great deal of pain, he likely would have refused to use that arm.

Dr. Moutsios testified that the MRI also revealed a subdural hematoma on the right side of the brain, subarchnoid bleeding on the right-hand side, and that some areas in the center parts of the brain appeared to be consistent with an ischemic or anoxic injury. The doctor indicated that the subdural hematoma indicated that C.W. had hit his head, or been hit in the head, with "severe force." The "anoxic injury," the doctor said, was caused by C.W.'s brain not getting enough oxygen and could have been caused by this injury or by previous injuries.

Dr. Moutsios testified that results from an ophthalmology examination of C.W.'s eyes revealed retinal hemorrhages in both of his retinas. This bleeding was so "extensive" in C.W.'s left eye that doctors felt that, if they did not address it, then C.W.'s brain might turn off that eye entirely. According to the doctor, retinal hemorrhages suggest swelling of the brain, which can occur as a result of a large subdural hemorrhage or from a shaking event,

either of which can cause traumatic brain injury.

Dr. Moutsios personally examined C.W. to evaluate his injuries. At the time of the examination, C.W. was sedated due to his "continuous seizure" and was, therefore, very sleepy and making only minimal movements with his upper and lower extremities. The doctor noted that C.W. was moving his right extremities more than his left, which caused her to be concerned that he had suffered a brain injury that was causing his motor deficit. Dr. Moutsios testified she treated C.W. over the next two weeks, during which she made several more observations. The doctor noted that it took several days for C.W. to become interactive and that, when he did, he was still not using his left side. C.W. was also not able to track a pen light, and the doctor expressed her concern that, at that point at least, his vision was impaired. At first, the doctor expected that C.W. might never again be alert enough to eat, but after two weeks he improved enough through therapy that he was able to eat orally.

Dr. Moutsios expressed her opinion that the only explanation for all of C.W.'s injuries was an adult-inflicted injury. Further, she stated that C.W.'s history with seizures beginning the Wednesday before his admission to the hospital indicated that he suffered from multiple brain injuries. The doctor stated, "My greatest concern is there's been repeated events for this child." She stated that the Defendant not bringing C.W. to the hospital on Wednesday when he first displayed seizure activity or on Friday morning when he again displayed seizure activity could have resulted in his subsequent respiratory distress. Dr. Moutsios said C.W.'s injuries were life-threatening by the time he was brought to the emergency room.

On cross-examination, Dr. Moutsios testified that she interviewed the Defendant in person only once. She agreed that, during this interview, the Defendant never used the word "seizure" but said that C.W. had "lock[ed] his joints." The doctor testified that C.W.'s medical records indicated that the Defendant was allowed to visit him in the hospital but that the police department was to be called if Watts attempted to see C.W.

Faye Okert, a detective with the Metro Police Department, testified that at the time of this incident she worked in the Youth Services Division, which investigated all crimes involving victims under the age of eighteen. On June 15 or 16, 2007, Detective Okert responded to Vanderbilt Hospital to investigate allegations of child abuse or neglect against C.W. The detective first interviewed the emergency room doctors, the patrol officers present, and the Defendant's parents. The Defendant's parents told the detective that C.W. had been hospitalized in April but did not provide her the details surrounding that hospitalization. She then interviewed the Defendant, who was in a lobby at Vanderbilt Hospital emergency room.

During the interview, the Defendant originally told the detective that she and C.W. lived alone in their home. She, however, ultimately said that her boyfriend, Watts, also lived

-8-

there. The Defendant claimed to be C.W.'s primary care provider and said that the last time she left him with anyone else was the week before his hospitalization when she left C.W. with Watts's relative, Nicole Riley, for thirty minutes. She said that two days before the hospitalization, C.W. experienced what she called seizures, where he gritted his teeth and clinched his hands, and his eyes rolled back into his head. C.W., however, "snapped out of it." About the events that occurred on the day of C.W.'s June hospitalization, the Defendant said that she and Watts had awakened at around 8:00 a.m. and gone downstairs to find C.W. standing at the couch leaned over asleep. The Defendant said she did not know how C.W. had gotten downstairs because she had not heard him cry. The Defendant said that she fed C.W. dry cereal and milk and that he ate "fine."

The Defendant told the detective that three or four times throughout the day C.W. would scream if she touched him even slightly and that he began having seizures where he would clinch his fist and grit his teeth, and his eyes would roll back into his head. The Defendant recalled that C.W. did not have any energy and did not walk at all that day. The Defendant fed C.W. bologna and water at 10:00 p.m., which he ate, and then she left C.W. in Watts's care briefly while she went to purchase some food. The Defendant said that, because C.W. had "snapped out" of his seizures two days before, she was waiting for him to "snap out" of the seizures again. The Defendant told the detective that C.W. had not been injured that day and that the only recent injury she could recall was when he fell off of a small riding toy the previous day.

The detective said she briefly asked the Defendant about C.W.'s previous hospitalization, and the two discussed the prior incident in more detail in subsequent interviews. Detective Okert testified she informed the Defendant several times that any information the Defendant could provide would help the doctors treat C.W. She told the Defendant that all the doctors could ascertain was that C.W. was suffering seizures, so the doctors could use the Defendant's help. The Defendant provided no further information.

The detective learned that a neighbor, not the Defendant, called 911 for the April and June incidents. On cross-examination, the detective stated that the Defendant did not have a home phone, so she would have been required to seek the assistance of a neighbor to have 911 called.

Detective Okert was later recalled and testified that she went to see C.W., while the Defendant was present, in the hospital on June 18, at which time she videotaped him. The video, which was entered into evidence and played for the jury, showed C.W. repeatedly moving or kicking his right leg while clicking his teeth together. The detective believed that this depicted C.W. having a seizure of some sort. The video showed he had bruises covering his forehead, his left leg was in some kind of brace, and his left arm was in a cast. C.W.

appeared visibly uncomfortable. The detective testified that medical personnel told her that the Defendant had not informed them that C.W. was exhibiting this type of behavior or that he was crying when touched.

Detective Okert testified that, later that same day, she also videotaped her interview with the Defendant at the Youth Services Office of the Criminal Justice Center. That video, which was entered into evidence and played for the jury, showed the detective giving the Defendant her Miranda warnings before speaking with her. The Defendant confirmed that she and Watts were home alone with C.W. all day on Friday and that the two were also home with him for most of Thursday, with the exception of briefly going to another child's birthday party from approximately 1:00 to 4:00 p.m. The detective later learned that Nicole, the mother of the child celebrating a birthday, was the person who had called 911 to get medical assistance for C.W. The Defendant stated that the three were also home all day together on Tuesday and Wednesday. On the Monday before C.W.'s hospitalization, the Defendant left C.W. with Nicole for approximately thirty minutes while she went with Watts to get re-certified for food stamps. The Defendant said C.W. appeared fine when she picked him up.

The Defendant stated that C.W. had not been to see her parents recently, but he stayed with her parents for three weeks after his April hospitalization. The Defendant denied that she caused any of the injuries to C.W., and she agreed that this meant that the only other potential person who could have harmed C.W. was Watts. She denied, however, that she had ever seen Watts shake or hurt C.W., offering that maybe C.W. fell down the stairs. The detectives informed her that the medical staff had informed them that there was no way C.W. could have inflicted these injuries upon himself, even accidentally. The Defendant then denied again that she caused these injuries or that she knew how they were caused.

As the interview continued, the detectives described C.W.'s injuries in more detail, saying that he had a fractured arm and several bleeding areas in his brain, some of which were older than others. The Defendant acknowledged that Watts had spent four years in jail for aggravated rape and aggravated kidnapping, but she explained that Watts's "baby mama" had "charged" he committed those offenses. Detective Okert told her that Watts could not have been convicted without evidence, to which the Defendant did not respond.

About the first incident in April, the Defendant said that Watts was taking care of C.W. while she went to the dentist. When she returned home at around noon, Watts told her that C.W. had fallen and hit his head while the two were taking out the trash. The Defendant said C.W. would not open his eyes, and she attempted to prevent him from sleeping because she heard that he could "pass out" if she allowed him to sleep. She said she walked him around for some period of time. She could not explain why she did not seek medical help until 7:00 p.m. that evening. Detective Okert told the Defendant that the April incident was similar to

the June incident in that, in both incidents, C.W. exhibited symptoms that should have caused her great concern, and she delayed in seeking him medical attention. The Defendant was adamant that Watts never hurt her child and that he never gave her a reason to fear him. She said that Watts never put his hands on C.W.

As the Defendant went through the events of the day before C.W. was hospitalized on June 15, 2007, the detectives tried to help the Defendant construct a time line of the day. After the detective pointed out discrepancies between her various accounts during this interview and previous interviews in the Defendant's time line for the day, the Defendant became distraught. They asked her if she really thought Watts would "quit hurting" her son, and the Defendant shook her head negatively. The Defendant acknowledged that Watts would likely blame her for C.W.'s injures. She also nodded in agreement that Watts would likely hurt a child again and that he may even hurt the child that she was currently carrying, which she said belonged to Watts.

After detectives implored her to be honest, the Defendant said, "All I know is that I woke up, and [C.W.] was screaming and crying and he was having seizures. But other than that, I don't know. I wasn't in the room." She said Watts was cleaning up C.W.'s room when she heard C.W. screaming and crying. Watts then brought C.W. into her bedroom, and C.W. was screaming and crying and gritting his teeth and locking his wrists. The Defendant said this scared her, but she did not know that C.W. was having seizures.

The Defendant nodded in agreement when Detective Okert asked the Defendant whether, over the eight weeks between the two incidents, Watts had hurt C.W. Detective Okert then asked the Defendant whether Watts was angry at the Defendant or angry at C.W. when he hurt C.W., and the Defendant responded that Watts was angry with C.W. The Defendant said that the only person who could have hurt C.W. was Watts. When asked how, the Defendant said, "He may have pushed him." The detectives reminded her that the force necessary to cause C.W.'s injuries was that caused during a car accident or by a baseball bat hitting C.W.'s head. The Defendant then said that she did not call for an ambulance all day because Watts told her not to call and to "wait and see what's going to happen."

The Defendant agreed that she did not think that the April incident was an accident and that she and Watts argued over this fact. She said that she did not know how C.W. got hurt in April but that "nobody can fall that hard and get as hurt as [C.W.] did." Eventually, the Defendant admitted that, during the eight weeks since the April incident, Watts would go into C.W.'s room and close the door, and she would hear him talking to and "yelling"at C.W. She said she heard Watts push C.W. down, but she never heard Watts "punch" C.W.. When the detectives told her that one cannot hear a "push," the Defendant said she heard a loud "thump" against the floor after which she heard C.W. crying. The Defendant then estimated that this

behavior would happen twice a day "all through the eight weeks." When the Defendant would ask Watts what happened, Watts would say that he had only hit C.W. on his hand. The Defendant said that, while she did not believe Watts, she thought the best thing she could do was not question Watts and comfort C.W. instead.

When the detectives asked how C.W. got the bruises on his face, the Defendant said she had seen Watts "thump" C.W., and she demonstrated how Watts would flick C.W.'s face with the fingers of his hand. She said she had also seen Watts grab the back of C.W.'s neck.

The Defendant requested a second interview, which Detective Okert conducted on June 21, 2007. The Defendant, during this interview, said she had been truthful when she said that she had not seen Watts hurt C.W. on the Friday C.W. was admitted into the hospital, but she said she suspected Watts had hurt him. She stated, because Watts had gone downstairs before her that morning, Watts had been alone with C.W. at a certain point. The Defendant said she was scared to tell the truth because, after the April incident and while C.W. was still staying with her parents, Watts threatened to shoot her mother and father if either she went back to live with them or her mother and father tried to pick her up.

The Defendant admitted that Watts was selling drugs around the time of these two incidents and that he stored drugs in her house. He would leave their home to sell drugs, come back to check on her and get more drugs, and leave to sell drugs again. The detectives informed the Defendant that they had spoken with Watts, who had told them that the Defendant often got frustrated with C.W. and could have, in frustration, caused these injuries. The detectives said Watts told them that the Defendant "thumped" C.W. and "pushed" C.W., and that he denied ever being alone in a room with C.W. with the door closed.

The Defendant then stated, "I caused some of the injuries." She said she only "pushed" C.W., and "that was it." She said she would push C.W. on his arm, and he would stumble and fall but not hit his head. The Defendant said she was not mad or angry at the time but that she was just playing with him. She then said she might have been a little bit frustrated when she pushed him. The detectives asked the Defendant if she ever hit or struck C.W. in any way, and she said she "used a belt sometimes." She said, "But whenever it bruised it wasn't that big." She said she hit him on his legs but rarely hit him on his arms. One time when she hit him with a belt on his arm for getting out of his playpen, C.W. had a bruise on his arm. On average, the Defendant "whipped" C.W. once a day with the belt. She estimated that she only caused a bruise on three occasions. The Defendant said she also sometimes pushed the back of C.W.'s head to get him to walk faster when the two were walking together. One time when she did this, he accidentally fell down. She said that "he just bruised easily." The Defendant also said that she sometimes "placed" C.W. in his playpen with such force that he would fall back and hit his head on the wall, which resulted in a knot or a bruise on his head. The

Defendant maintained, however, that she did not cause any of the bruises hospital staff observed when he arrived to the emergency room. She said the last time she threw him in his playpen was well before his April hospitalization.

The Defendant said when she would get frustrated with C.W. she would ask Watts to deal with C.W. Watts agreed, but he would go into the room and shut the door. She said that it was on these occasions that she would heard a "thump" and Watts would tell her that he had pushed C.W. down. After these "thumps," the Defendant would hear C.W. cry loudly. The Defendant said that, on one of the occasions she heard a "thump", Watts told her that he had pulled C.W.'s shirt over his head, which caused C.W. to run into a wall. The Defendant said that, after this particular incident, she saw a bruise. She acknowledged that it was unlikely that C.W. had run into the wall on his own so forcibly that it left a bruise. The Defendant said Watts would then leave, and she would comfort C.W.

About the April incident, the Defendant said she did not believe Watts when he said that C.W. fell in the gravel. Instead, she believed Watts had pushed C.W. down. She said she returned from the dentist at around 1:00 p.m. and that Watts told her C.W. had fallen. She found C.W. asleep in his room with a large knot on his forehead. She told Watts she was going to take C.W. to the hospital, and he told her not to do so. She said that she insisted on taking C.W. and that she asked a neighbor for a ride to the hospital. That neighbor initially agreed, and the Defendant waited for two to four hours for the ride, but the neighbor eventually refused to take her but instead called 911 for her at 7:00 p.m. The Defendant said she knew that she needed to take C.W. to the hospital because he was in pain, which he expressed by crying "off and on" between when she got home at 1:00 p.m. and when the ambulance arrived. The Defendant said, when the ambulance arrived, she asked the ambulance drivers to take C.W. to Baptist and not to Vanderbilt because she believed that Baptist would not involve DCS. The ambulance personnel informed her that Baptist was not equipped to deal with a head trauma such as this, and she agreed to go to Vanderbilt.

The Defendant described the events leading up to C.W.'s hospitalization on Friday June, 16, 2007, stating that on Tuesday before the hospitalization, in the late afternoon, Watts got mad at C.W. because C.W. started crying when Watts entered the Defendant's bedroom. Watts asked C.W., "Why are you crying, you don't like me or something." Watts then said, "I'm gonna make him like me." The Defendant said Watts took C.W. into C.W.'s room, and she heard Watts say, "You a mama's boy, you always wanna be around your mama." The Defendant said she came out of the bedroom to see what Watts was doing, and she saw Watts push C.W. on the chest area. C.W. fell on his bottom and continued to cry. Watts then helped C.W. up saying, "Get up punk," and then pushed him down again, this time on the side of his arm. C.W. hit the right side of his head on the floor. Watts then said, "[G]o on get away from me," and pushed C.W. again. C.W. then started crying "worse." The Defendant estimated

-13-

that Watts was with C.W. in the room for thirty minutes while she watched. Watts then told the Defendant not to get C.W. and left the house. The Defendant said she waited for about five minutes to see if Watts was going to come back before she went and took C.W. back into the bedroom with her. She noticed that he had a bruise on the right side of his head.

About the seizure on Wednesday, the Defendant said that before the seizure Watts told her to take the trash out. At the time, C.W. was in his room in the play pen, and Watts took him to her room and changed C.W.'s diaper. While she was taking out the trash, she heard C.W. crying. Then, Watts called out to her from the window saying that C.W. was having a seizure or something. She went into the house and asked Watts what he had done. Watts said he did not do anything. The Defendant said she did not call 911 because Watts told her not to and because, after C.W. had the seizure, C.W. "snapped out of it" and was walking and playing.

The Defendant said she saw Watts jerk on C.W.'s arm on the Wednesday or Thursday[2] before they went to the birthday party. She said Watts got mad at C.W. because he would not stop crying, called him a "cry baby," and jerked his arm. The Defendant grabbed C.W.'s arm while the two were in the kitchen and dragged him into the living room. Watts then took C.W. into C.W.'s bedroom, and Watts told her to "go on and get in the shower." The Defendant went to get ready for the party when she heard C.W. fall, and she agreed this was the "loudest thump" she had ever heard. Watts told her that C.W. was standing on a riding toy when he fell. The Defendant saw a large knot on the right side of C.W.'s head and said she suspected Watts caused the fall. The Defendant said she knew that Watts had hurt C.W.'s arm because he cried every time she touched it or when she would hold his hand, but she denied that she knew that C.W.'s arm was broken. When detectives asked her why she did not stop Watts, the Defendant said she did not think Watts was going to hurt C.W. further.

Thursday night, Watts's friend "Michael" stayed the night at the Defendant's house, with Watts, the Defendant, and C.W. When she woke up on Friday, Watts and C.W. were in C.W.'s room, which Watts was cleaning. When the Defendant woke up, she heard C.W. screaming and crying. Watts brought C.W. to the Defendant because C.W. was having seizures. The Defendant said these seizures were different because C.W. was screaming during the seizure. C.W. also bit down so hard on his own cheeks that his cheeks were bleeding. Watts told her that he had found C.W. downstairs when he woke up and that C.W. was standing up by the couch sleeping. Watts placed C.W. on the Defendant's bed and then left the house. The Defendant did not call 911 while Watts was gone. When Watts returned, she told him that C.W. had snapped out of it. The Defendant said that Watts told her not to

---

[2]The Defendant at different points in the interview states that the injury occurred on Wednesday and at other times she states that the injury occurred on Thursday.

call 911, so she did not, saying she did not have a telephone. The Defendant said that C.W. did not act like "himself" the remainder of the day, explaining that he was sleepy and could only focus his eyes "a little bit."

The Defendant recalled that, later that night, Watts told her to go get some food, so she went to get food from a neighbor's house. As she was walking home, she saw Watts standing on the front porch. When Watts saw her he yelled that C.W. had stopped breathing. She ran upstairs, picked him up, and he gasped for air. She heard Watts calling for someone to call an ambulance, and her neighbor came and performed CPR on C.W. until paramedics arrived. Watts had already left by the time paramedics arrived.

The Defendant agreed that she knew Watts was hurting C.W. and that she allowed it to happen. She agreed that she seemingly cared more about losing Watts than about losing her son.

After the videotaped interview was played for the jury, Detective Okert testified that she went to the Defendant's house and retrieved the belt the Defendant said she used to "whoop" her son.

On cross-examination, Detective Okert testified that the Defendant seemed to have difficulty telling the truth during the interview and that she seemed easily confused about whether the events she described happened on Wednesday, Thursday, or Friday. The detective agreed that the Defendant's sister said she was scared of Watts. The sister also confirmed that the Defendant had told her that Watts threatened to hurt their parents.

The State rested, and the Defendant offered the testimony of her father, John Edward Watkins, who testified that the Defendant was nineteen years old and Watts was twenty-six years old at the time of the April incident. The Defendant "graduated" from high school with a Special Education Diploma, which constituted a certificate of attendance, showing that she had attended school but that she had not passed her "Gateway Exam." The Defendant, he said, reads and writes on a second grade level. He also described the Defendant as getting "easily confused" and said that, if someone repeatedly called her a "liar," she would likely acquiesce to whatever they stated she was lying about.

Watkins testified that, when Watts arrived at the hospital after the April incident, he claimed to be C.W.'s father and demanded to see him. Watkins told the hospital staff, in Watts's presence, that Watts was not the father and that C.W.'s father lived in Murfreesboro. Watts became angry and screamed obscenities at Watkins, and security asked Watts to leave. The Defendant also confirmed to the hospital staff that Watts was not C.W.'s father and told Watts to leave.

-15-

Watkins said that, after the April incident, C.W. was released into his care, where he was to remain for a period of three weeks. Tolston, the DCS worker assigned to C.W.'s case, informed Watkins and the Defendant they would need her approval in order to return C.W. to the Defendant's care. Watkins said C.W. stayed with him for three weeks and then with his grandmother for another three weeks. Watkins, at some point, contacted Tolston and asked for approval for C.W. to return to the Defendant's care, and Tolston said she had already made a visit to the Defendant's home and approved it, so C.W. could return home.

Watkins testified that the Defendant at one point moved into Watkins's home with C.W. but that, because Watts repeatedly called her, she returned to Nashville. The Defendant again expressed an interest in moving back home, and Watkins and his wife went to get her on June 7. When they arrived, Watts told them the Defendant was not leaving and that he "ruled" her house. Watkins told Watts that Watts's name was not on the lease and that he would call the police if Watts did not leave. Watts left, but, shortly thereafter, the Defendant told Watkins and her mother to leave also. She told them, however, that they could take C.W. with them. They walked outside but their keys were locked in the car. As they were trying to get into the car, Watts returned with seven or eight other men. Watkins said he called 911 and told the dispatcher that some men were getting ready to "jump" them. A police officer arrived, and Watts and the other men stopped. The officers told Watkins that the Defendant was allowed to have anyone she wanted in her home and that Watkins should leave, so he did.

Watkins recalled that, after C.W.'s second hospitalization in June, the Defendant told him that Watts said he was going to shoot Watkins and the Defendant's mother if they interfered again with her living in Nashville.

Watkins testified that, at the time of trial, he had custody of C.W., who was progressing "astonish[ingly]" well. C.W. attends physical therapy, speech therapy, occupational therapy, and preschool. One of his physical therapists said she could not see "any signs of any kind of brain trauma." His other therapists said C.W.'s rapid progression was due, in part, to his extreme intelligence.

On cross-examination, Watkins testified he first learned that Watts had threatened his life after C.W.'s June hospitalization and after the Defendant had spoken to Detective Okert. Watkins also said that the Defendant told him that C.W. had fallen down the stairs, which had caused the injuries that led to his June hospitalization. Watkins testified that he expressed his concerns that Watts had caused C.W.'s injuries to the hospital staff and also to Tolston. Tolston told him that C.W. could not return to live with the Defendant unless Watts was no longer living there. Watkins admitted, however, that, when C.W. returned to live with the Defendant from May 7 to May 10, Watts was also residing with the Defendant.

-16-

The Defendant's mother, Pamela Watkins, testified that the Defendant was "crying hysterically" at the hospital because her baby, C.W., had been hurt. Pamela Watkins confirmed much of the testimony offered by her ex-husband, John Watkins, adding that after C.W.'s April hospitalization she overheard Watts telling one of his friends that he wanted to "get her," pointing at Pamela Watkins. After that, the Defendant informed her that Watts wanted to kill her father, John Watkins. Pamela Watkins testified that she had always feared Watts because the Defendant had told her that Watts was involved in a gang. Pamela Watkins said C.W. was living with her on May 29, the date that Tolston said she conducted a home visit of the Defendant's home and saw C.W. living at home with the Defendant. She agreed that the Defendant had told Tolston that Watts was no longer living with her and that she did not know how to get in touch with him. Just a few days later, the Defendant and Watts came to her home to retrieve C.W., but Pamela Watkins never contacted Tolston to tell her as much.

Based upon this evidence, the jury convicted the Defendant of attempted child neglect, a Class A misdemeanor; four counts of aggravated child abuse, a Class A felony; and two counts of aggravated child neglect, a Class A felony. The trial court sentenced the Defendant to twenty years for each of her aggravated child abuse convictions and twenty years for each of her aggravated child neglect convictions. It sentenced her to eleven months and twenty-nine days for her attempted child neglect conviction. It ordered that the sentences for aggravated child abuse run consecutively to each other but concurrently to the sentences for aggravated child neglect, for a total effective sentence of forty years to be served in the Tennessee Department of Correction.

## II. Analysis

On appeal, the Defendant contends that: (1) the evidence is insufficient to sustain her convictions for aggravated child abuse and aggravated child neglect; and (2) the trial court erred when it ordered her sentences to run consecutively.

### A. Sufficiency of Evidence

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the

finger of guilt is pointed unerringly at the Defendant and the Defendant alone." *State v. Smith*, 868 S.W.2d 561, 569 (Tenn. 1993). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W .2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S .W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

The Defendant challenges the sufficiency of each of her felony convictions. Given the multiple counts involved in this case, we reproduce below a summary of the facts supporting each of the Defendant's convictions as alleged in the State's Election of Offenses:

> Count Two of the Indictment alleged the Defendant committed child neglect against C.W. by failing to seek timely medical treatment for head injuries C.W. sustained on April 16, 2007.

Count Three of the Indictment alleged the Defendant committed aggravated child abuse against C.W. by causing C.W. severe head injuries on or about June 15, 2007, including anoxic brain damage, acute subdural and subarachnoid hemorrhage, retinal hemorrhages and severe seizures.

Count Four of the Indictment alleged the Defendant committed aggravated child neglect against C.W. by neglecting his welfare and failing to seek timely medical treatment for the seizures and decreased physical abilities C.W. experienced on June 15, 2007.

Count Five of the Indictment alleged the Defendant committed aggravated child neglect against C.W. by neglecting his welfare and failing to seek timely medical treatment for seizures C.W. experienced on Wednesday June 13, 2007.

Count Six of the Indictment alleged the Defendant committed aggravated child abuse against C.W. by causing him a subdural hematoma and other brain trauma between May 29, 2007 and June 15, 2007.

Count Seven of the Indictment alleged the Defendant committed aggravated child abuse against C.W. by causing him a fracture to the left ulna, near his wrist, between May 29, 2007 and June 15, 2007.

Count Eight of the Indictment alleged the Defendant committed aggravated child abuse against C.W. by causing him bruises and other injuries between May 29, 2007 and June 15, 2007 by striking him with a belt, a deadly weapon or dangerous instrumentality.

### 1. Count Two: Attempted Child Neglect

The only argument presented by the Defendant about this conviction is contained in a footnote that reads, "As to the allegation of neglect in count two, Dr. Stack's ultimate diagnosis of the child in April, 2007, was a concussion caused by abuse or neglect. (T.T. p.201). As such, the proof was insufficient that [the Defendant] was guilty of neglect on this occasion." The State counters that the proof showed that C.W. suffered a significant brain injury in April and that the Defendant's delay in seeking treatment could have had potentially serious consequences. The State argues that, because the jury could infer from the proof that the Defendant took substantial steps in delaying seeking medical treatment for C.W., the evidence was sufficient to support the elements of attempted child neglect.

According to the statute under which the Defendant was indicted, child abuse and

neglect is committed by "[a]ny person who knowingly abuses or neglects a child under eighteen (18) years of age, so as to adversely affect the child's health and welfare, commits a Class A misdemeanor; provided, that, if the abused or neglected child is six (6) years of age or less, the penalty is a Class E felony." T.C.A. § 39-15-401(b) (2006). "The offense of child abuse and neglect proscribed is a single offense that may be committed through one of two courses of conduct: child abuse through injury and child abuse through neglect." *State v. Mateyko*, 53 S.W.3d 666, 668 n.1 (Tenn.2001) (citing *State v. Hodges*, 7 S.W.3d 609, 622 (Tenn. Crim. App.1998)).

The Defendant was acquitted of the offense as charged in the indictment and convicted of the lesser included offense of attempted child abuse and neglect. Tennessee's attempt statute states:

> (a) a person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
>
> > (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;
> >
> > (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
> >
> > (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.
>
> (b) Conduct does not constitute a substantial step under subdivision (a)(3) unless the person's entire course of action is corroborative of the intent to commit the offense.

T.C.A. § 39-12-101(a)-(b) (2006).

In *Mateyko*, the Tennessee Supreme Court examined the elements of the offense of attempted child neglect. *State v. Mateyko*, 53 S.W.3d 666, 671 (Tenn. 2001). The Supreme Court held that first, "the State must prove that the defendant intentionally engaged in conduct constituting child neglect or that his conscious objective or desire was to neglect his children."

*Id*. 53 S.W.3d at 676 (citing T.C.A. § 39-11-302(a)); *see also State v. Christopher Collins*, No. M2009-01674-CCA-R3-CD, 2011 WL 346433, at *5 (Tenn. Crim. App., at Nashville, Feb. 4, 2011), *no Tenn. R. App. P. 11 application filed*. The State must also prove "that the defendant took a substantial step toward the commission of that offense." *Mateyko*, at 673. Because "the offense of child abuse through neglect is principally a nature-of conduct offense . . . the State has no burden . . . to show that the defendant intended that his children suffer adverse effects to their health and welfare." *Id*. at 676-77.

Viewed in the light most favorable to the State, the evidence in this case proved that, when the Defendant returned from the dentist around 1:00 p.m. on April 16, 2007, and became aware that C.W. had hit his head, she suspected that Watts had hurt C.W. While the Defendant's story was not consistent, she primarily contended that she found C.W. asleep in his room with a large knot on his forehead when she returned from the dentist. She also said that C.W. would not open his eyes and that she attempted to prevent him from sleeping because she heard that he could "pass out" if she allowed him to sleep. The Defendant said she asked a neighbor for a ride to the hospital. That neighbor agreed, and the Defendant said she waited for two to four hours for the neighbor to provide the ride. The neighbor then eventually said she would not take the Defendant to the hospital but, apparently, called 911 around 7:00 p.m.

The Defendant knew she needed to take C.W. to the hospital because he cried "off and on" between when she got home at 1:00 p.m. and when the ambulance arrived. When the ambulance arrived, the Defendant asked the ambulance drivers to take C.W. to Baptist and not Vanderbilt because she believed that Baptist would not involve DCS. The ambulance personnel informed her that Baptist was not equipped to deal with a head trauma such as this, and she agreed to go to Vanderbilt.

At the hospital, Dr. Stack examined C.W. and formed the opinion that C.W.'s injuries were the result of "suspected child abuse or neglect." The abuse or neglect resulted in multiple contusions to C.W.'s face and brain and also a concussion. The doctor explained that the delay in C.W.'s arrival to the hospital, seven hours after the reported injury, could have led to severe complications.

We conclude that sufficient evidence exists to support the jury's finding that the Defendant committed attempted child neglect by delaying seeking medical treatment for C.W. The Defendant clearly stated that she knew that C.W. should go to the hospital for his injuries, because he was crying, unable to open his eyes, and sleepy. She even asked a neighbor to take her there. She then, however, waited seven hours before seeking treatment for C.W. She excused her behavior by saying that no one wanted to let her use their phone to call 911. The jury found this excuse implausible, as do we. The Defendant expressed her fear that C.W.

-21-

would be taken from her if she sought medical care, and she even asked the ambulance responders to take C.W. to Baptist, thinking that Baptist employees were less likely to involve DCS. Dr. Stack expressed his belief that the seven-hour delay could have led to severe complications for C.W. We conclude the evidence proved that the Defendant intentionally engaged in conduct constituting child neglect and that she took a substantial step toward so doing. As such, the evidence supports her conviction.

### 2. Counts Three, Six, and Seven: Aggravated Child Abuse

The Defendant contends the evidence is insufficient to sustain her convictions for aggravated child abuse in Counts Three, Six, and Seven. She asserts that the proof showed that Watts caused C.W.'s injuries that were the bases of her convictions and that there was insufficient proof that the two June head injuries, one alleged to have occurred before Wednesday and causing the Wednesday seizures, and the other alleged to have occurred sometime between Wednesday and Friday and causing the Friday seizures, were the result of two separate and distinct acts. The State counters that the theory it presented to the jury at trial was that the Defendant was criminally responsible for Watts's actions. Therefore, while the evidence may have proven that Watts committed the actual acts of violence, it also proved that the Defendant was criminally responsible based upon her duty to protect her own child from harm and upon her presence and companionship with Watts before and after he hurt C.W. Further, the State contends that Dr. Moutsios testified that the injuries on Wednesday were separate from those that occurred before the Friday hospitalization.

To sustain the Defendant's conviction for aggravated child abuse, the State had to prove that the defendant committed the offense of child abuse or neglect and that the conduct resulted in serious bodily injury to the child. *See* T.C.A. § 39-15-402(a)(1) (2006). Child abuse occurs when a person "knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury." T.C.A. § 39-15-401(a) (2006). Bodily injury includes "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty . . . ." T.C.A. § 39-11-106(a)(2) (2006). "'Serious bodily' injury means bodily injury that involves: [a] substantial risk of death; [p]rotracted unconsciousness; [e]xtreme physical pain; [p]rotracted or obvious disfigurement; or [p]rotracted loss or substantial impairment of a function of a bodily member, organ or mental faculty[.]" T.C.A. § 39-11-106(a)(34)(A)-(E) (2006).

The Tennessee Supreme Court recently stated, "[O]ur statute provides that one 'is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both.'" *State v. Dorantes*, 331 S.W.3d 370, 386 (Tenn. 2011) (citing T.C.A. § 39-11-401(a)

(1997)). Criminal responsibility, while not a separate crime, is an alternative theory under which the State may establish guilt based upon the conduct of another. *Id.* (citing *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999)). Multiple theories by which the State may prove that a defendant is criminally responsible for the conduct of another exist: First, a defendant may be criminally responsible for the conduct of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" T.C.A. § 39-11-402(2). Under this theory of criminal responsibility, "presence and companionship with the perpetrator of a felony before and after the commission of the crime are circumstances from which an individual's participation may be inferred.'" *State v. Dorantes*, 331 S.W.3d 370 (Tenn. 2011) (quoting *State v. Phillips*, 76 S.W.3d 1, 9 (Tenn. Crim. App. 2001)).

A second theory of criminal responsibility is based upon a defendant's relationship with the victim. A defendant may be criminally responsible for the crime of another when, "having a duty imposed by law or voluntarily undertaken to prevent commission of the offense and acting with intent to benefit in the proceeds or results of the offense, or to promote or assist its commission, the [defendant] fails to make a reasonable effort to prevent commission of the offense." T.C.A. § 39-11-402(3). A parent has a duty imposed by law to "protect [his or her child] from harm and provide [him or her] with emergency attention." *State v. Nelson Aguilar Gomez & Florinda Lopez*, No. M2008-02737-CCA-R3-CD, 2010 WL 3528982, at *18 (Tenn. Crim. App., at Nashville, Sept. 10, 2010), *Tenn. R. App. P. 11 application GRANTED* (Tenn. Feb. 16, 2011) (citing *State v. Hodges*, 7 S.W.3d 609, 623 (Tenn. Crim. App. 1998) (citations omitted)).

**Count Three.** The charge of aggravated child abuse in Count Three was based upon the head injury C.W. suffered on or about June 15, 2007, which resulted in anoxic brain damage, acute subdural and subarachnoid hemorrhage, retinal hemorrhages, and severe seizures. The evidence proved that the Defendant was aware that Watts beat C.W., often taking him into a room behind closed doors to do so. With this knowledge, the Defendant still asked Watts to "deal" with C.W. when she herself became frustrated with C.W. On these occasions, she would hear "thumps" and then hear C.W. cry loudly. When Watts would exit the bedroom and leave the apartment, the Defendant would go to C.W., find that he had "bumps" and "bruises," and attempt to comfort C.W.

On the Thursday before C.W.'s June 16 hospitalization, the Defendant saw Watts jerking C.W.'s arm, dragging him from the kitchen to the living room, and taking C.W. into his bedroom, where she knew Watts would continue to use physical force to discipline C.W. Watts told her to go take a shower, and she complied. While she was in the shower, the Defendant heard the "loudest thump" she had ever heard. Watts told her that C.W. was

standing on a riding toy when he fell. The Defendant saw a large knot on the right side of C.W.'s head and said she suspected Watts caused the fall. Medical testimony proved that C.W.'s "bumps" and "bruises" and the large knot on the side of his head constituted "serious bodily injury."

We conclude that the evidence is sufficient to show that the Defendant failed to make a reasonable effort to prevent Watts's commission of aggravated child abuse because she failed to protect the victim from harm. She knew that Watts regularly beat C.W. and that he often did so in C.W.'s bedroom. Before showering, she saw Watts engaging in violent behavior toward C.W., which she knew, based upon past experiences, was likely to continue once Watts and C.W. entered C.W.'s room. Despite this, she left C.W. alone with Watts while she took a shower, breaching her duty to protect her son. *See State v. Hodges*, 7 S.W.3d at 623. We conclude that the evidence, viewed in the light most favorable to the State, is sufficient to sustain the Defendant's conviction for aggravated child abuse in Count Three. The Defendant is not entitled to relief on Count Three.

**Count Six.** Count Six of the indictment alleged the Defendant committed aggravated child abuse against C.W. by causing him a subdural hematoma and other brain trauma between May 29, 2007, and June 15, 2007. This Count refers to the "old" injuries seen by the medical team treating C.W., some of which were likely the cause of C.W.'s seizures on Wednesday, June 13, 2007.

First, we find unpersuasive the Defendant's contention that there was no proof that the Wednesday seizures were caused by an injury different from the Friday seizures. Dr. Moutsious testified that her examination of C.W. showed that he had current head trauma and also an older brain injury, stating specifically that C.W. suffered from "multiple brain injuries." Detective Okert testified that C.W. had both old and new brain injuries at the time of his June hospitalization, and the Defendant herself testified that she had seen Watts hurt C.W. both the day before the Wednesday seizure and also the day before the Friday seizure. We conclude, therefore, that the record establishes that C.W. sustained these injuries on separate occasions.

We also conclude that the evidence is sufficient to support the Defendant's conviction. The day before C.W.'s Wednesday seizures, Watts got mad at C.W. because he cried when Watts entered the Defendant's bedroom. Watts then went to C.W.'s bedroom and asked, "Why are you crying, you don't like me or something[?]" Watts next said, "I'm gonna make him like me." Watts then took C.W. into C.W.'s room and told him, "You a mama's boy, you always wanna be around your mama." When the Defendant came out of her bedroom to see what Watts was doing, she saw Watts push C.W. on the chest area. C.W. fell on his bottom and continued to cry. Watts then helped C.W. up saying, "Get up punk," and then pushed him

down again, this time on the side of his arm, causing C.W. to hit the right side of his head on the concrete floor when he struck the ground. Watts then said, "[G]o on get away from me," and pushed C.W. again. C.W. then started crying "worse." The Defendant estimated that Watts was with C.W. in the room for thirty minutes while she watched. Watts put C.W. in his playpen and told the Defendant not to remove C.W. from his playpen, and he left the house. After about five minutes, the Defendant removed C.W. from his playpen and brought him back into her bedroom. She noticed that he had a bruise on the right side of his head. The following morning, the Defendant took out the trash, leaving C.W. with Watts. While she was outside, Watts called to her that C.W. was having a seizure. C.W. experienced seizures, gritting his teeth and clinching his hands while his eyes rolled back into his head. The Defendant attributed her failure to seek medical attention to the fact that C.W. "snapped out of it."

This evidence is sufficient to support the jury's finding that the Defendant, who had a legal duty to protect her son, was criminally responsible for Watts's actions. By her own account, the Defendant stood watching Watts physically abuse C.W. for thirty minutes without intervening. Before and after the beating, she allowed Watts to remain in her home, even leaving Watts at home alone with C.W. the day after this abuse while she took out the trash. She was, by her actions, complicit in Watts's behavior, and she is criminally responsible for the injuries he inflicted upon her son. The Defendant is not entitled to relief on this issue.

**Count Seven.** Count Seven of the indictment alleged the Defendant committed aggravated child abuse against C.W. by causing a fracture to C.W.'s left ulna, near his wrist, between May 29, 2007, and June 15, 2007. The evidence presented proved the Defendant saw Watts jerk on C.W.'s arm on the Wednesday or Thursday before they went to a birthday party because he was angry that C.W. would not stop crying. Watts, still holding C.W.'s arm, dragged him from the kitchen into the living room. Rather than intervene, the Defendant then watched as Watts dragged C.W. into C.W.'s bedroom. Watts told her to "go on and get in the shower," and she complied, leaving the two alone. The Defendant knew that Watts had hurt C.W.'s arm because C.W. cried every time she touched it or when she would hold his hand. We conclude that the Defendant's failure to intervene before or after Watts jerked on C.W.'s arm proved her complicity in his actions and breached her duty of protecting her son from harm. *See Hodges*, 7 S.W.3d at 623. She is, therefore, criminally responsible for Watts's actions, and the evidence is sufficient to support her conviction in Count Seven.

## 2. Count Eight – Aggravated Child Abuse

The Defendant asserts the evidence is insufficient to support her conviction for aggravated child abuse in Count Eight, which was based upon her striking C.W. with a belt. The indictment identified the belt as "a deadly weapon or dangerous instrumentality." The

Defendant states that the trial court only instructed the jury on the definition of "deadly weapon" and offered no instruction on the definition of "dangerous instrumentality." She argues that, because the State did not make an election between the two and because it offered only the definition of "dangerous instrumentality," she did not receive a unanimous verdict on her conviction for aggravated child abuse in Count Eight. The State counters that it was not required to elect between a "deadly weapon" instruction and a "dangerous instrumentality" instruction because the two definitions of the belt constitute only a theory of the violation of the crime. Further, it asserts that the definition of "deadly weapon" encompasses the definition of "dangerous instrumentality" and requires more proof than the proof required to show a "dangerous instrumentality." As such, it argues, the Defendant was afforded a unanimous verdict.

The child abuse and child neglect statute in effect at the time of this offense read, in relevant part: "(a) Any person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury commits a Class A misdemeanor; provided, however, that if the abused child is six (6) years of age or less, the penalty is a Class D felony" T.C.A. § 39-15-104(a) (2006). "A person commits the offense of aggravated child abuse or aggravated child neglect or endangerment who commits the offense of child abuse as defined in § 39-15-401(a) . . . and: . . . (3) A deadly weapon, dangerous instrumentality or controlled substance is used to accomplish the act of abuse, neglect or endangerment . . . ." T.C.A. § 39-15-402(a) (2006). Aggravated child abuse or neglect is a Class A felony. T.C.A. § 39-15-402(b).

### a. Election

The first issue we must decide is whether the State was required to elect whether it was seeking the aggravated child abuse conviction based upon the belt being a "deadly weapon" as opposed to a "dangerous instrumentality," two of the alternate theories listed in Tennessee Code Annotated section 39-15-402(a)(3). The State elected the following facts:

> Count Eight of the Indictment alleged the Defendant committed aggravated child abuse against by causing him bruises and other injuries between May 29, 2007 and June 15, 2007 by striking him with a belt, a deadly weapon or dangerous instrumentality.

The Tennessee Code section relevant here states in part:

> Where the intent with which, the mode in, or the means by which, an act is done are essential to the commission of the offense, and the offense may be committed with different intents, in different modes, or by different means, if

-26-

the jury is satisfied that the act was committed with one (1) of the intents, in one (1) of the modes, or by either of the means charged, the jury shall convict, although uncertain as to which of the intents charged existed, or which mode, or by which of the means charged, the act was committed.

T.C.A. § 40-18-112 (2006).

In *State v. Cureton*, 38 S.W.3d 64, 72 (Tenn. Crim. App. 2000), this Court examined the sufficiency of the evidence to support a felony murder conviction when the State proposed two possible theories of the case: that the defendant killed the victim in a failed robbery attempt; or, in the alternative, that the defendant's cohort killed the victim in a failed robbery attempt and the defendant was criminally responsible for her cohort's actions. The Court noted that it had no way of knowing which theory the jury ultimately accepted. *Id.* The Court concluded, however, that the evidence presented at trial was sufficient to support the conviction based upon either theory. *Id.* (citing T.C.A. § 40-18-112 (1997) (providing that a jury shall convict if it is satisfied that the crime was committed through "either of the means charged," when it is capable of being committed by different means); *Schad v. Arizona*, 501 U.S. 624, 649, (1991); *State v. Lemacks*, 996 S.W.2d 166, 170-71 (Tenn. 1999) (holding that no jury unanimity concerns were implicated by guilty verdict by a jury which was invited to convict the defendant upon an alternate theory of criminal responsibility for the act of another); *Charlie W. Dunn and Joyce Watkins v. State*, No. 01C01-9504-CR-00119, 1999 WL 799338, at *10 (Tenn. Crim. App., Nashville, Oct. 8, 1999) (holding that a jury may reach a valid verdict despite disjunctively-presented, alternative theories of homicide–premeditated or felony murder)). In accordance with this reasoning, we conclude that the State was not required to elect whether it was alleging that the belt was a "dangerous instrumentality" as opposed to a "deadly weapon."

### b. Jury Instruction

The Defendant also contends she did not receive a unanimous verdict because the jury was only instructed on the definition of "deadly weapon" and not on "dangerous instrumentality." The trial court instructed the jury with regard to Count Eight as follows:

Deadly weapon means a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury; or anything that in the manner of its use or intended use is capable of causing death or serious bodily injury.

The trial court did not provide the jury with a definition of "dangerous instrumentality" in part because the statute defining that term had been changed between the time of the offense and

-27-

the trial date, as had the statute defining serious bodily injury. Currently, a "deadly weapon" is defined by statute as "anything designed for, adapted for, or in its intended use, is capable of causing death or serious bodily injury." T.C.A. § 39-11-106(a)(5) (2009). A "dangerous instrumentality" is defined by statute as "any item, in its manner of use or intended use, is capable of inflicting serious bodily injury to a child." T.C.A. § 39-15-402(e) (2009). The definition of deadly weapon provided to the jury required the State to prove that the belt was a deadly weapon capable of causing death or serious bodily injury. In our view, the definition of "deadly weapon" that was provided to the jury encompassed that of "dangerous instrumentality," which had the practical effect of increasing the State's burden of proof as to this element of the offense.

This Court has previously stated, "When applied to a small child, a belt or a fist can certainly be a deadly weapon, since the question of whether a weapon is deadly depends on 'the attendant circumstances and the possible use thereof.'" *State v. Brenda Harris*, No. 01-C-019010CR00247, 1991 WL 186850, *14 (Tenn. Crim. App., at Nashville, Sept. 24, 1991) (citing *State v. Haynes*, 720 S.W.2d 76, 81 (Tenn. Crim. App. 1986) and 77 CJS (Robbery) § 25, p. 465), *perm. app. denied* (Tenn. Feb. 24, 1992). Because a belt can be a deadly weapon and because the jury in this case was only provided the definition of a deadly weapon, we conclude that the evidence is sufficient to sustain the Defendant's conviction for aggravated child abuse and that she received a unanimous verdict as required. She is not entitled to relief on this issue.

### 3. Count Four and Count Five: Aggravated Child Neglect

The Defendant argues that the record contained proof that her delay in seeking medical treatment for C.W. did not result in injury, much less "serious bodily injury," which, she asserts, a conviction for aggravated child neglect requires. The State counters that the proof showed that the seizures themselves carry a "substantial risk of death," which meets the applicable definition of "serious bodily injury."

As previously stated, at the time of the offense, the relevant child abuse and neglect statute stated as follows: "Any person who knowingly abuses or neglects a child under eighteen (18) years of age, so as to adversely affect the child's health and welfare, commits a Class A misdemeanor; provided, that, if the abused or neglected child is six (6) years of age or less, the penalty is a Class E felony." T.C.A. § 39-15-401(a)-(b) (2006). The relevant aggravated child abuse and aggravated child neglect statute stated as follows: "(a) A person commits the offense of aggravated child abuse or aggravated child neglect or endangerment, who commits the offense of child abuse, as defined in § 39-15-401(a), or who commits the offense of child neglect or endangerment, as defined in § 39-15-401(b), and: (1) The act of abuse or neglect results in serious bodily injury to the child." T.C.A. § 39-15-402(a)(1)

(2006).

"Serious bodily injury" is defined as injury involving: "(A) A substantial risk of death; (B) Protracted unconsciousness; (C) Extreme physical pain; (D) Protracted or obvious disfigurement; or (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty." T.C.A. § 39-11-106(34).[3] "[B]efore a conviction for child neglect may be sustained, the State must show that the defendant's neglect produced an actual, deleterious effect or harm upon the child's health and welfare." *State v. Mateyko*, 53 S.W.3d 666, 671-72 (Tenn. 2001). Furthermore, "a mere risk of harm in the neglect context is . . . insufficient." *Id.* at 671.

In applying this principle to instances where a defendant is convicted of both aggravated child abuse and aggravated child neglect, this Court has held that there must exist some evidence that the alleged act of neglect resulted in serious bodily injury in addition to and apart from the serious bodily injury caused by the initial act of abuse. *State v. Wanda Elaine Brock*, No. E2009-00785-CCA-R3-CD, 2011 WL 900053, at *6 (Tenn. Crim. App., at Knoxville, Mar. 16, 2011) (holding the evidence was insufficient to support the defendant's convictions for aggravated child neglect because record devoid of evidence that any delay in seeking medical attention caused the victim any injury), *no Tenn. R. App. P. 11 application filed*; *State v. Marcos Acosta Raymond, a.k.a. Marcus Raymundo Acosta*, No. M2009-00726-CCA-R3-CD, 2010 WL 4540207, at *14-15 (Tenn. Crim. App., at Nashville, Nov. 10, 2010) (holding evidence of aggravated child neglect to be insufficient where proof did not show that alleged act of neglect-defendant's delay in seeking medical attention-had any harmful effect on the victim's health), *no Tenn. R. App. P. 11 application filed*; *State v. John Barrow*, No. W2008-01128-CCA-R3-CD, 2010 WL 1687772, at *11 (Tenn. Crim. App., at Jackson, Apr. 26, 2010) (holding insufficient evidence to support aggravated child neglect conviction where evidence showed that initial act of abuse caused serious bodily injury-not delay in seeking medical attention), *perm. app. denied* (Tenn. Sep. 24, 2010); *State v. Denise Wiggins*, No. W2006-01516-CCA-R3-CD, 2007 WL 3254716, at *5 (Tenn. Crim. App., at Jackson, Nov. 2, 2007) (holding insufficient proof presented to establish that act of neglect resulted in serious bodily injury), *no Tenn. R. App. P. 11 application filed*.

**Count Four.** Count Four of the indictment alleged the Defendant committed aggravated child neglect against C.W. by neglecting his welfare and failing to seek timely medical treatment for the seizures and decreased physical abilities C.W. experienced on June 15, 2007. During the day of June 15, 2007, C.W. suffered multiple seizures, appeared to be

---

[3]We note that subsequent amendments to the aggravated child abuse statute provide a definition of serious bodily injury specific to the offense. This definition includes "second- or third-degree burns" as one of the many examples of serious bodily injury applicable to the offense. T.C.A. § 39-15-402(d) (2009).

sleepy, and otherwise behaved abnormally. Despite these clear indications that C.W. was not well, the Defendant sought medical treatment only when C.W. stopped breathing. Emergency medical personnel arrived, performed CPR, and ventilated C.W. because he suffered "labored respirations" and had an abnormally low heart rate of 84 beats per minute. Additionally, the emergency responders administered medication in an attempt to stop his seizures. An MRI later showed that areas of C.W.'s brain revealed injury caused by a lack of oxygen. Further medical testimony indicated that each seizure creates an independent, substantial risk of death. Because the Defendant's failure to seek medical attention for C.W. until after he stopped breathing caused injury to C.W.'s brain from the lack of oxygen, her failure meets the definition of "serious bodily injury" in that it caused "substantial impairment of a function of a bodily member, organ or mental faculty." Further, her failure to seek medical treatment after the first seizure posed a substantial risk of death to C.W. in addition to the risk posed by his initial injury and initial seizure. We conclude, therefore, that the evidence is sufficient to support her conviction in Count Four for aggravated child neglect, and she is not entitled to relief.

**Count Five.** Count Five of the indictment alleged the Defendant committed aggravated child neglect against C.W. by neglecting his welfare and failing to seek timely medical treatment for seizures C.W. experienced on Wednesday June 13, 2007. Again, each seizure creates an independent, substantial risk of death. Dr. Moutsios testified that each seizure potentially caused decreased oxygen to the brain and respiratory arrest. Further, C.W.'s MRI revealed that his brain suffered injury from a lack of oxygen, which could have been caused by any of the seizures. The proof, however, indicated that C.W. suffered one seizure on Wednesday morning and that he acted normally the rest of the day. While the Defendant's failure to seek medical treatment for C.W. was despicable, the testimony presented did not prove that her delay resulted in serious bodily injury in addition to that which resulted from her June 15, 2007, delay, which supports her conviction for aggravated child neglect in Count Four. *See Raymond*, 2010 WL 4540207, at *14-15. Consequently, we conclude that there is insufficient evidence to support the Defendant's conviction for aggravated child neglect in Count Five of the indictment. We reverse that judgment of conviction, vacate the verdict, and direct the trial court to dismiss Court Five on remand.

## B. Sentencing
### 1. Evidence Introduced at the Defendant's Sentencing Hearing

The following evidence was presented at the sentencing hearing: the parties agreed that, because the Defendant was a Range I standard offender, the applicable sentencing range for each of her Class A felony convictions was fifteen to twenty-five years. The State requested that the trial court apply five enhancement factors to the Defendant's sentence and asked the trial court to declare her a "dangerous offender" and impose consecutive sentencing.

The Defendant filed a motion requesting that the trial court consider several mitigating factors.

Charles Chandler, M.D., testified he was a pediatrician at the Murfreesboro Medical Clinic and had been C.W.'s primary care physician since C.W.'s birth. Dr. Chandler was notified that C.W. suffered a severe injury for which he was treated by Vanderbilt Hospital and, later, by a rehabilitation facility in Atlanta. The Atlanta rehabilitation facility, which treated C.W. for twenty-two days, classified C.W.'s injury as a "non-accidental traumatic brain injury." The injury resulted in subarachnoid and subdural hematomas, injury to the basal ganglia, retinal hemorrhages, hypertension, and constipation. After the rehabilitation facility in Atlanta released C.W., Dr. Chandler resumed caring for him.

Dr. Chandler testified that C.W.'s condition had somewhat improved by the time he returned from the Atlanta rehabilitation facility. However, he said that C.W., then seventeen months old, was functioning at the level of a six-month old child. He had weakness on his left side, visual impairment, transient seizures, language and motor delays, and global developmental delay. Dr. Chandler prescribed physical therapy, occupational therapy, and speech therapy.

Dr. Chandler testified that he last examined C.W. the month before the sentencing hearing, when C.W. was three years old. The doctor said C.W.'s language skills at this time were still "significantly delayed" in that he could only say fifty words and utter two-word sentences. Normal three-year-olds, he said, have several hundred words and can make three to five-word utterances. C.W. was, however, making progress. The doctor predicted that C.W. would continue to struggle in school due to his "receptive and expressive delays" and that, as C.W. got older, more delays might become apparent. Dr. Chandler testified that over fifty percent of children suffering this type of injury have long term delays such as difficulty in learning, difficulty in reading, and visual or auditory perceptual problems.

Dr. Chandler noted that C.W.'s physical difficulties had somewhat improved. Initially, after the injury, C.W. had significant left-side weakness and had to wear an ankle foot orthosis and special shoes to help him with ambulation. He also had to wear a helmet because he was clumsy and not aware of dangers in his environment. The doctor testified that C.W. still had some left-side weakness and trouble with his fine motor coordination, which had somewhat improved. The doctor said that C.W. ignored his left hand unless prompted to use it, which was to be expected since he had a significant right brain injury.

On cross-examination, Dr. Chandler testified that, after C.W.'s first check-up with him as a newborn, he became concerned about C.W.'s welfare based upon the Defendant's behavior, which he described as detached. He ordered a social services consult, and social

services visited the Defendant and C.W. They noted that the Defendant's mother was heavily involved in C.W.'s care, so they felt comfortable leaving C.W. in that situation.

Emily Wright, a speech and language pathologist, testified that she treated C.W. after Dr. Chandler prescribed speech therapy. She said that he attended fifty-five speech therapy sessions with her over a period of sixteen months. Wright recalled that C.W.'s grandfather brought him to the therapy sessions most often but that C.W.'s grandmother had also occasionally brought him. When Wright first assessed C.W., he was twenty-months old, and his language was that of a child less than a year of age. Over the course of their working together, C.W.'s language improved to the level of that of a two-year-old. Wright recalled that C.W. was ultimately discharged from speech therapy for missing too many scheduled appointments.

Several witnesses testified on the Defendant's behalf during sentencing. Reverend Isaiah Dalton testified and described the Defendant as "pleasant," "quiet," "gentle," and "loving." He said she was excited when her son was born and very proud of him. The Reverend had never seen the Defendant act violently but said she was easily influenced by other people. Stephanie Dalton, the Defendant's cousin, testified that she grew up with the Defendant, who was always a "little bit slower than the other kids." Dalton found the Defendant "loving" toward C.W. and said she had never seen the Defendant act violently. She agreed the Defendant was easily influenced by other people. Jessica Brodley testified she was "best friends" with the Defendant in middle school and said she had seen the Defendant interact with C.W. She described the Defendant as interacting with him "very well" and said the Defendant was never violent.

Reverend Dwight Ogleton testified that he knew C.W. through the Defendant's father's church attendance. The reverend described C.W. as "very attached" to his grandfather and said he acted like "any other three or four-year-old." He said that, while he had noticed C.W. sometimes wearing a helmet, there were no other indications that he was different in any other way.

The Defendant's sister, Janelle Watkins, testified that the Defendant was severely picked on by other kids when they were growing up. The Defendant, she said, had problems understanding social interactions and whom to trust. Watkins said she had never seen her sister act violently, even when she lived with her sister and C.W. in Nashville. Watkins said that she disliked Watts and that on multiple occasions she told her sister, who seemed to fear Watts, that she disliked Watts. On cross-examination, Janelle Watkins testified that the Defendant never stated that she was scared of Watts. She agreed, instead, that she herself was scared of him, in part because of his gang affiliation.

John Watkins, the Defendant's father, testified and reminded the trial court about the threats that Watts had made to the Defendant against Watkins's life and also the life of the Defendant's mother. He said he felt these threats were the reason that the Defendant did not call him and ask him to help her return to Murfreesboro. John Watkins agreed with the other witnesses that the Defendant was easily influenced by other individuals, which he said was displayed during her interviews with police when she changed her story to match what she believed they wanted to hear. John Watkins said the Defendant had completed multiple courses since being incarcerated and expressed her desire to "make up for" what had happened. On cross-examination, Watkins said he currently had C.W. in a different speech therapy program, as well as physical therapy, occupational therapy and preschool. He said C.W. spoke in more than two-word phrases, and, in fact, asked for his mother.

Pamela Watkins, the Defendant's mother, testified that the Defendant moved to Nashville against their wishes. Nonetheless, the Defendant appeared to be thriving until she met Watts, who brought people into the Defendant's house "day and night." She lamented that, although she said she suspected that Watts was "not right," she never pursued the issue and, thereby, exposed her daughter and grandson to danger. She asked for leniency for the Defendant because everyone "makes mistakes." Watkins offered the court several letters written by the Defendant's friends on the Defendant's behalf.

The Defendant testified that she did not mean for her son to get hurt and that she did not intervene because she was scared. She said she testified at Watts's trial, and she explained that her testimony was kind of scattered, explaining that she was scared during Watts's trial, too. On cross-examination, the Defendant said her convictions were the result of her allowing her son to get hurt. When asked if she knew that he was being hurt, she responded, "No, not really." She explained she was "blinded by love." The Defendant agreed that, after the April incident, she argued with the hospital staff to ignore the other bruises on C.W. because they were "irrelevant." She explained that she was "upset" at the time. She said she was concerned about the other bruises, and she knew that they had come from Watts. Still, she allowed her son to be around Watts. Even after C.W.'s seizures on Wednesday, June 13, and Friday, June 15, she left her son alone with Watts while she went to get food. The Defendant agreed she repeatedly turned a "blind eye" to the "welfare of [her] son."

Upon questioning by the court, the Defendant said that her statements to police about how she had seen Watts hurt her son were true. She agreed she did not testify to any of those incidents at Watts's trial, explaining that she was "scared." The Defendant then said that she never saw Watts jerk C.W.'s arm or hurt him. She said Watts did sometimes go into a room with C.W. and close the door and she would hear things "knocking" in there. The Defendant said she did not know what was going on in the room and that she "couldn't tell" whether C.W. was scared of Watts.

The Defendant said she went to Murfreesboro to retrieve her son after the April incident because she "wanted" him back with her. She acknowledged she brought her son to live with her despite the fact that she was still living with Watts, whom she knew had hurt her son.

The trial court sentenced the Defendant based upon this evidence, after stating that it had followed the proscribed statutory procedure and had presided over the trials of both Watts and the Defendant and listened to the testimony presented therein as well as the testimony and exhibits presented at sentencing. The trial court sentenced the Defendant to eleven months and twenty-nine days for her misdemeanor conviction and to twenty years for each of her Class A felony convictions, applying enhancement factor (4), that the victim was particularly vulnerable due to his young age; enhancement factor (5), that the Defendant allowed the victim to be treated with exceptional cruelty; and enhancement factor (14), that the Defendant abused a position of trust that facilitated the commission of this offense.

Before ordering consecutive sentencing for the Defendant, the trial court stated:

> The only one that possibly fits for this case is that she's a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. Clearly all of these offenses – and just because you're convicted of multiple dangerous offenses does not necessarily mean you are eligible for consecutive sentences. I have to go further and find that the aggregate term reasonably relates to the severity of the offenses and it's necessary to protect the public from further serious criminal conduct by the [D]efendant. I do find she is a dangerous offender. Now, what I do find is that I'm going to – I do find it is necessary – these sentences are incredibly severe. She had an opportunity to prevent some of them and chose not to do that. I'm going to – Counts 3, 4, and 5 are going to be running concurrent with each other. Count 2 is going to be 11/29. That's all going to be concurrent. Consecutive to that is going to be six, seven, and eight so that – given the fact that some of these things occurred over time. She does have some good things in her background but at the same time I'm finding that's what is necessary to relate to the severity of these offenses and to protect the public. . . . Her total effective sentence then is going to be forty years.

## 2. Analysis of Sentencing

On appeal, the Defendant does not contend that the trial court erred in setting the length of her sentences or in its application of enhancement factors. She argues only that the trial court erred when it ordered partial consecutive sentencing, for an effective sentence of

forty years. She notes that, by all accounts, she has been developmentally slower than her peers and that she was scared of Watts. Her sentences, she asserts, do not promote justice. The State counters that the record supports the trial court's findings.

When a defendant challenges the length, range, or manner of service of a sentence, this Court must conduct a de novo review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d) (2006). This presumption, however, is conditioned upon the affirmative showing in the record that the trial court properly sentenced the defendant. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). As the Sentencing Commission Comments to this section note, the burden is on the appealing party to show that the sentencing is improper. T.C.A. § 40-35-401, Sentencing Comm'n Cmts. If the trial court followed the statutory sentencing procedure, made findings of facts which are adequately supported in the record, and gave due consideration to the factors and principles relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result was preferred. T.C.A. § 40-35-103 (2006), *State v. Ross*, 49 S.W.3d 833, 847 (Tenn. 2001). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. *State v. Dean*, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); *State v. Butler*, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); *State v. Smith*, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994). In the event the record fails to demonstrate the required consideration by the trial court, appellate review of the sentence is purely de novo. *Ashby*, 823 S.W.2d at 169.

In conducting a de novo review of a sentence, we must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2009); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

The Criminal Sentencing Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence. Under the Act, a trial court may impose a sentence within the applicable range as long as the imposed sentence is consistent with the Act's purposes and principles. T.C.A. § 40-35-210(c)(2) and (d) (2006); *see State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008).

In the case under submission, the Defendant does not contend that the length of each

of her sentences is improper. Instead, she argues only that the trial court erred when it ordered that her sentences run consecutively. If an offender meets one or more statutory criteria in Tennessee Code Annotated section 40-35-115, whether he or she should be sentenced consecutively or concurrently is within the sound discretion of the trial court. *State v. James*, 688 S.W.2d 463, 465 (Tenn. Crim. App. 1984). A court may order multiple sentences to run consecutively if it finds, by a preponderance of the evidence, that at least one of seven factors exists. T.C.A. § 40-35-115(b)(1)-(7). In addition to these criteria, consecutive sentencing is subject to the general sentencing principle that the length of a sentence should be "justly deserved in relation to the seriousness of the offense" and "no greater than that deserved for the offense committed." T.C.A. § 40-35-102(1), 103(2); *see also State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002). Rule 32(c) of the Tennessee Rules of Criminal Procedure instructs a trial court to explicitly recite on the judgment its reasons for imposing a consecutive sentence.

The sentencing criteria used by the trial court in this case is factor (4), which allows a trial court to order consecutive sentencing if "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." T.C.A. 40-35-115(b)(4) (2006). Our Supreme Court has noted that the "dangerous offender" category is the hardest and most subjective to apply. *State v. Lane*, 3 S.W.3d 456, 460 (Tenn. 1999). Consequently, our Supreme Court in *State v. Wilkerson* held that "particular facts" must show the following in order to base consecutive sentencing on subsection 115(b)(4): (1) that an extended sentence is necessary to protect the public against further criminal conduct by the defendant; and (2) that the consecutive sentences reasonably relate to the severity of the offenses committed. *Lane*, 3 S.W.3d at 460; *State v. Wilkerson*, 905 S.W.2d 933, 938-39 (Tenn. 1995); *see State v. Robinson*, 146 S.W.3d 469, 524 (Tenn. 2004).

We conclude that the trial court did not abuse its discretion when it ordered consecutive sentencing. The Defendant was convicted of aggravated child abuse for beating her son with a belt and also for aggravated child abuse because she was criminally responsible for watching, or sometimes listening to, Watts beat her son for lengthy periods of time. These beatings caused C.W. to be hospitalized in April, after which C.W. was placed in the Defendant's parents' care. The Defendant, knowing that Watts had beaten her son, nonetheless brought her son back from her parents' house to live with her and Watts because she "wanted" to have him with her. Shortly thereafter, on June 12, 2007, Watts beat her son so severely that C.W. suffered seizures for which the Defendant did not seek treatment. On the Tuesday prior to C.W.'s June hospitalization, Watts jerked on C.W.'s arm so hard that he broke it and dragged him by the same arm into an adjacent room. Two days later, the Defendant watched Watts beat her son, repeatedly pushing him down against a concrete floor. On Friday, he suffered seizures for which she again did not seek treatment until a neighbor

called 911 because C.W. was no longer breathing. We conclude this evidence supports the trial court's finding that the Defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. Further, as the trial court found, the public, including C.W. and the child the Defendant had with Watts, need protection from her. Considering the severity of this offense, including that C.W. will likely suffer permanent and lasting effects from the Defendant's refusal to intervene when he was being beaten, warrant consecutive sentencing. The Defendant is not entitled to relief on this issue.

## II. Conclusion

After a thorough review of the record and the applicable law, we conclude the evidence is sufficient to support all of the Defendant's convictions except her conviction in Count Five for aggravated child neglect by neglecting to seek timely medical treatment for seizures C.W. experienced on Wednesday June 13, 2007. Therefore, we reverse that judgment of conviction, vacate the verdict, and direct the trial court to dismiss Court Five on remand. All the other judgments of conviction are affirmed. We further conclude that the trial court properly ordered consecutive sentencing.

_____
ROBERT W. WEDEMEYER, JUDGE